**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ALI NADZHAFALIYEV,                             )
                                               )
         Plaintiff,                            )
                                               )
         v.                                    )         Case No. 16 C 6844
                                               )
DANIEL HARDY, individually, JEFF PHARIS,       )         Judge Rebecca R. Pallmeyer
individually, ANTHONY NIDEA, individually,     )
GHOUSE MOHIUDDIN, individually, TOM            )
COMEFORD, individually, and MEREDITH KISS,     )
individually and in her official capacity,[1]  )
                                               )
         Defendants.                           )

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Ali Nadzhafaliyev was a civil detainee at the Elgin Mental Health Center ("EMHC")

from 2005 to March 2019. In this lawsuit, he alleges that EMHC personnel violated his rights

under the Eighth and Fourteenth Amendments by refusing his repeated requests for special bed

support to alleviate his chronic back pain and ignoring his repeated complaints that his room was

too cold. Defendant Meredith Kiss, EMHC's Administrator, is sued in her individual and official

capacities. The remaining EMHC Defendants are sued in their individual capacities: Daniel

Hardy, the Medical Director; Jeff Pharis, the Forensic Director; Dr. Anthony Nidea, a medical

doctor; Dr. Ghouse Mohiuddin, a psychiatrist; and Tom Comeford, a Nurse Manager. Plaintiff

asserts a claim under 42 U.S.C. § 1983 against all Defendants for failure to provide a reasonable

medical accommodation in violation of the Eighth Amendment. (*See* Third Am. Compl., Counts

I.) He also asserts a claim under Section 1983 against Defendants Hardy, Pharis, and Comeford

---

[1]     Plaintiff incorrectly spells Pharis as "Pharris" and Mohiuddin as "Mouhoudini" in the
operative complaint. (*See* Third Am. Compl. [54]).) Plaintiff originally sued all Defendants in their
official capacities but now sues only Defendant Kiss in her official capacity. (*Compare* Compl. [1]
*with* Third Am. Compl.) Plaintiff has dropped his claim against Elgin Mental Health Center.
(*Compare* Compl. *with* Third Am. Compl.)

for failure to provide medical treatment in violation of the Eighth Amendment. (*See id.*, Count II.) Finally, he asserts a claim against all Defendants for intentional infliction of emotional distress under Illinois law. (*See id.*, Count IV.)[2] Defendants now move for summary judgment on all claims. For the following reason, Defendants' motion is granted in part and denied in part.

## BACKGROUND

In 2005, Plaintiff was found not guilty by reason of insanity for an unspecified offense. (Resp. to Defs.' L.R. 56.1 Stat. of Undisputed Material Facts ("Pl.'s L.R. 56.1 Resp.") [102] ¶ 3.) As a result, he was committed to EMHC for an indefinite time. (*Id.*; *see also id.* ¶ 1 (agreeing that all times relevant to this action, Plaintiff was a civil detainee at EMHC).)[3] EMHC is divided into different housing units. (*See id.* ¶ 5.) For his first few months at EMHC, Plaintiff lived in the Pinel unit. (*Id.*) Next, he lived in the K unit for approximately one year; the N unit for nine years; the M unit for nine months; and the L unit from August 2017 until his release. (*id.*)

At all times relevant to this action, Defendant Kiss was the Administrator of EMHC. (*Id.* ¶ 23.) Kiss directly supervised all Defendants. (*See id.* ¶ 24.) Defendant Pharis was EMHC's Forensic Director at all relevant times. (*Id.* ¶ 19.)[4] Defendant Hardy was EMHC's Medical Director at all relevant times through May 31, 2017. (*Id.* ¶ 9.) Defendant Dr. Nidea was Plaintiff's primary care physician during his entire stay at EMHC. (*Id.* ¶ 22.) Defendant Dr. Mohiuddin was Plaintiff's treating psychiatrist at EMHC beginning in December 2016. (*Id.* ¶ 8.) Defendant Comeford began working as a Nurse Manager at EMHC in 2011. (Comeford Dep., Ex. 1 to Pl.'s

---

[2]     Plaintiff agrees that his claim under Section 1983 for injunctive relief against Defendant Kiss is moot because he is no longer detained at EMHC. (*See* Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.") [101] at 10.) The court dismisses that claim (Count III of the Third Amended Complaint) with prejudice.

[3]     The parties agree that "[a]s of March 22, 2019, Plaintiff is no longer a resident of EMHC." (*Id.* ¶ 2.) The court assumes this means he was released from civil detention. Plaintiff now lives in Chicago, Illinois. (*Id.*)

[4]     Neither side explains Pharis's job duties as a Forensic Director.

L.R. 56.1 Stat. of Add'l Facts [102-1] at 17:8-11.)  Comeford was Plaintiff's Nurse Manager for approximately six of the nine years he lived in the N unit at EMHC and for a few months while he lived in the M unit.  (Pl.'s L.R. 56.1 Resp. ¶¶ 6-7.)  While living at EMHC, Plaintiff received treatment not only from Defendants Dr. Nidea and Dr. Mohiuddin, but also from a chiropractor, a physical therapist, and doctors at University of Illinois Chicago.  (*Id.* ¶ 32.)  Plaintiff attended "Monthly Staffing Meetings" where he could voice concerns to EMHC staff about his health and living facilities. (*See, e.g., id.* ¶¶ 10, 46.)

**A.    Bed Accommodation**

Before Plaintiff was involuntarily committed to EMHC, he was involved in three car accidents that caused injuries to his back.  (*Id.* ¶ 4.)  He suffers from chronic back pain.  (*Id.*)  Plaintiff alleges that throughout his stay at EMHC, he complained to Defendants about his back pain and asked for a "better sleeping surface."  (Pl.'s L.R. 56.1 Stat. of Add'l Facts ("Pl.'s L.R. 56.1  Stat.") [102] ¶¶ 1-3.)  According to Plaintiff, Defendants ignored his request for this accommodation until 2016, when they bolted a piece of plywood to his bedframe.  (*See* Pl.'s L.R. 56.1 Resp. ¶ 41.)  The parties' Local Rule 56.1 Statements paint an incomplete picture of Plaintiff's complaints and Defendants' responses, including their chronology.  The court has done its best to identify the undisputed facts and present them clearly.

The court begins with Plaintiff's complaints to his physician, Defendant Dr. Nidea.  Dr. Nidea testified during his deposition that he never made an independent determination that Plaintiff needed "greater bed support", and that none of Plaintiff's other medical providers— including physical therapists and orthopedic surgeons—advised Plaintiff that they had made such a determination.  (Pl.'s L.R. 56.1 Resp. ¶ 34; *see also id.* ¶ 40 (Plaintiff's admission that during his own deposition, he could not provide the names of any doctors who told him that sleeping on a flat surface would improve his back pain.))  It is undisputed that Plaintiff approached Dr. Nidea with the idea that "bed support" might alleviate his pain.  (*Id.* ¶ 35; *see also* Dr. Nidea Dep., Ex. 13 to Defs.' L.R. 56.1 Stat. [85-13] at 28:21-30:7.)  The parties do not specify what kind of bed

support Plaintiff requested nor when he first raised the idea. But according to Dr. Nidea's deposition testimony, Plaintiff first asked about bed support while he was living in the K unit. (*See* Dr. Nidea Dep. at 30:10-14, 31:12-15.) That was sometime in 2005 or 2006. (*See* Pl.'s L.R. 56.1 Resp. ¶¶ 3, 5.)

In response to Plaintiff's request, Dr. Nidea asked "the nurse manager, forensic director, and medical director" whether it was possible to provide Plaintiff with additional bed support. (*Id.* ¶ 36; *see* Dr. Nidea Dep. at 30:19-31:6.) Dr. Nidea explained that he needed their approval to order the equipment. (Dr. Nidea Dep. at 30:24-31:2.) At the time, Defendant Pharis was the Forensic Director and Defendant Hardy was the medical director. (Pl.'s L.R. 56.1 Resp. ¶¶ 9, 19.) It is unclear who was serving as the Nurse Manager at the time, as Defendant Comeford did not hold that role until 2011. (Comeford Dep. at 17:8-11.) Defendants denied the request because of "safety issues." (Pl.'s L.R. 56.1 Resp. ¶ 37; Dr. Nidea Dep. at 31:7-8.) The parties do not describe what equipment Dr. Nidea requested nor identify the specific safety issues, but Dr. Nidea testified that the safety issues were "something about how they're going to try to secure the board in his bed without that being loose or being used as a weapon or used as a barricade in his room or something like that." (Dr. Nidea Dep. at 32:18-23.) As the court interprets this testimony, it appears that Plaintiff's initial request was for a board or flat surface to put beneath his mattress. After the request was denied, Plaintiff began sleeping on the floor of his room. (Pl.'s L.R. 56.1 Resp. ¶ 38.) When asked if he "believe[s] that someone sleeping on the floor for a more firm support is reasonable," Dr. Nidea testified, "It's too hard. I mean, there's no support. . . . [T]hat may even aggravate it. You may get muscle spasms." (Dr. Nidea Dep. at 33:19-34:10; *see* Pl.'s L.R. 56.1 Resp. ¶ 39.) He also testified that "bed supports" like "a firm mattress" can help support one's back. (Dr. Nidea Dep. at 27:6-14; *see* Defs.' Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ("Defs.' L.R. 56.1 Resp.") [108] ¶ 8.)

Approximately 10 years later, in September 2016, Plaintiff "was given a new bed with a support." (Pl.'s L.R. 56.1 Resp. ¶ 41.) The support "was a piece of plywood approximately half

4

an inch thick, which was bolted to the bed frame." (*Id.*) Defendants maintain that "[t]his type of bed support had not been recommended in the past due to concerns regarding infection control and patient safety." (Defs.' L.R. 56.1 Stat. of Undisputed Material Facts ("Defs.' L.R. 56.1 Stat.") [85] ¶ 42.) Plaintiff disputes this assertion but does not cite contrary evidence. (*See* Pl.'s L.R. 56.1 Resp. ¶ 42.) Defendants, for their part, provide e-mails from September 29 and 30, 2016 in which Defendant Comeford wrote to Defendant Pharis and others that a plywood board "was not recommended in the past" because of "infection control issues. In time the board may start to sag, the paint will eventually peel, and may pose a safety risk if a patient takes a piece of the wood to make a [sic] item that could harm others." (Sept. 2016 Comeford E-Mails, Ex. 14 to Defs.' L.R. 56.1 Stat. [88-4] at 1.) Defendants also maintain that they suggested using a metal hospital bed instead. (Defs.' L.R. 56.1 Stat. ¶ 43.) Plaintiff disputes this assertion as well, but again cites no contrary evidence. (*See* Pl.'s L.R. 56.1 Resp. ¶ 43.) In the September 29 and 30, 2016 e-mails, Comeford wrote that he recommended "modifying the other bed with a metal support"; that "[t]his has been addressed before"; and that "[t]hey need to come up with a metal support or medical justification." (Sept. 2016 Comeford E-mails at 1.) It is unclear whose responsibility it was to "come up with" one of those alternatives. (*Id.*) Despite Defendants' safety concerns about the plywood board, Plaintiff kept it for some time. Indeed, in an October 3, 2016 e-mail from Defendant Comeford to Defendants Pharis, Kiss, Hardy, and third parties, Comeford wrote that there "remains a concern regarding the bed that was delivered last week. It does pose a [sic] Infection Control concern. Please advise." (*See* Oct. 2016 E-Mails, Ex. 15 to Defs.' L.R. 56.1 Stat. [88-5] at 1.)

According to Defendants, "Plaintiff was ultimately given a hospital bed, despite the absence of a doctor order or any medical indication that he needed on[e]." (Defs.' L.R. 56.1 Stat. ¶ 45.) In support of the assertion that Plaintiff received a hospital bed, Defendants cite Dr. Nidea's testimony at his May 14, 2018 deposition that "[w]e just got [the hospital bed for Plaintiff] recently. I would say probably less than six months." (Dr. Nidea Dep. at 43:17-21; *see* Defs.'

L.R. 56.1 Stat. ¶ 45.)  In support of the assertion that a hospital bed was not medically necessary,
Defendants cite a March 28, 2016 e-mail from Eleonore Tiu, a third party, to Defendants
Comeford, Dr. Nidea, and others.  (*See* Defs.' L.R. 56.1 Stat. ¶ 45.)  Ms. Tiu wrote that Plaintiff
was "asking for a hospital bed due to c/o back pain" and she inquired whether there was "really a
need for the bed[.]"  (Mar. 28, 2016 Tiu E-mail, Ex. 16 to Defs.' L.R. 56.1 Stat. [88-6] at 1.)  She
added, "Our hospital beds are used for pts who are debilitated . . . or those who need the head of
their beds elevated . . . . MD has to order the hospital bed because they would know if it is really
indicated for the pt."  (*Id.*)  Defendant Comeford responded, "Patients are trying to get hospital
beds without medical indications.  [Redacted] was removed a couple weeks ago and [Plaintiff] is
requesting.  Currently is getting followed up with Dr. Nidea and PT."  (*Id.*)

Plaintiff disputes that he ever received a hospital bed, despite his insistence that the bed
was medically necessary, but he cites no evidence in support of his position.  (*See* Pl.'s L.R. 56.1
Resp. ¶ 45.)  Regarding medical necessity, the court notes that defense counsel asked Dr. Nidea
during his deposition why the hospital bed was requested.  Dr. Nidea answered, "Well, because
we hadn't gotten the proper mattress for him.  And well, he still continues to complain of lack of
bed support."  (Dr. Nidea Dep. at 43:22-44:1.)  He added, "I think we got lucky that there was
another gentleman in the unit that didn't want his hospital bed. . . . So we made an exchange for
that other individual's hospital bed to give it to [Plaintiff]."  (*Id.* at 44:2-6.)  Dr. Nidea also testified
that he had to ask the nurse manager (Defendant Comeford) to give Plaintiff the bed.  (*See id.* at
44:19-45:1.)

Plaintiff alleges that until he received the plywood bed support in 2016, he complained to
Defendant Comeford "daily" about his back pain.  (Pl.'s L.R. 56.1 Resp. ¶ 46.)  Comeford testified
during his deposition that Plaintiff first approached him about back pain "within [his] first year as
nurse manager," which was in 2011.  (Comeford Dep. at 16:11-14, 17:8-16); *see* Defs.' L.R. 56.1
Resp. ¶ 4.)  According to Comeford, Plaintiff told him that "he didn't like the mattress and the
support of the bed."  (Comeford Dep. at 23:12-14; *see* Defs.' L.R. 56.1 Resp. ¶ 4.)  At some point,

Plaintiff submitted a written complaint to Defendant Comeford; the parties do not specify when this happened, or what kind of bed accommodation he was requesting. (*See* Defs.' L.R. 56.1 Resp. ¶ 6.) The parties agree that Comeford marked the form "unable to resolve" and "forwarded it to the program director." (*Id.*) Comeford testified that as of his August 31, 2018 deposition, to his knowledge, the program director had not responded to Plaintiff's complaint. (*See* Comeford Dep. at 45:19-22; *see* Defs.' L.R. 56.1 Resp. ¶ 6.) Defendants maintain that Comeford would not necessarily have known if the program director had responded because, according to Comeford, the program director delivers complaint responses directly to patients. (Defs.' L.R. 56.1 Resp. ¶ 6 (citing Comeford Dep. at 44:24-45:22).)

Plaintiff communicated with other Defendants about the bed request, as well. The parties agree that at Monthly Staff Meetings, Plaintiff told Hardy that he was experiencing back pain and asked for a "bed accommodation." (Pl.'s L.R. 56.1 Resp. ¶ 10.) They also agree that Plaintiff "informed Defendant Pharis about his desire for a bed support." (*Id.* ¶ 20.) In Plaintiff's response to Pharis's First Set of Interrogatories, which Defendants cite, Plaintiff stated that he told Pharis about his back pain "approximately once a week" when Pharis visited his room. (Pl.'s Resp. to Pharis Interrogatories, Ex. 9 to Defs.' L.R. 56.1 Stat. [85-9] ¶ 1; Defs.' L.R. 56.1 Stat. ¶ 20 (citing same).) Plaintiff does not offer any evidence that he communicated directly with Defendant Dr. Mohiuddin. Rather, he alleges that because Dr. Mohiuddin was his treating psychiatrist, he "had an obligation to adequately review [his] medical records and provide appropriate care," and "failed to ensure at the Monthly Staffing Meetings that his needs were being met." (Defs.' L.R. 56.1 Stat. ¶ 30 (quoting Pl.'s Resp. to Mohiuddin Interrogatories, Ex. 12 to Defs.' L.R. 56.1 Stat. [85-12] ¶ 1); Pl.'s L.R. 56.1 Resp. ¶ 30.) Similarly, Plaintiff admits that he never told Defendant Kiss that he was sleeping on the floor (Pl.'s L.R. 56.1 Resp. ¶ 25), but he asserts that in her supervisory role, Kiss "was allegedly made aware of all issues by her staff members and failed to act." (Defs.' L.R. 56.1 Stat. ¶ 24 (quoting Pl.'s Resp. to Kiss Interrogatories, Ex. 11 to Defs.' L.R. 56.1 Stat. [85-11] ¶ 2); Pl.'s L.R. 56.1 Resp. ¶ 24.)

7

Defendants insinuate that Plaintiff's complaints of back pain were not credible because, according to Defendants, the Monthly Staff Meeting records from "May 2013 through February 2017 reflect that Plaintiff affirmatively denied that he was experiencing any back pain. They also reflect that Plaintiff indicated that he did not need any medication for pain, and that he would request it if he did need it." (Defs.' L.R. 56.1 Stat. ¶ 47.) Plaintiff disputes this characterization of the records but does not explain why or cite contrary evidence. (*See* Pl.'s L.R. 56.1 Resp. ¶ 47.) From the court's review of the records, it appears that on May 1, 2013, Plaintiff met with a nurse about his chronic back pain and stated: "I don't have pain, I will ask for medicine if I need it." (Monthly Staff Meeting Records, Ex. 17 to Defs.' L.R. 56.1 Stat. [85-17] at DHS Defs000155.) The nurse wrote that Plaintiff "is active, independent and high functioning." (*Id.*) Similar records exist for every month through February 2014. (*See id.* at DHS Defs000172, 181, 193, 206, 215, 231, 241, 272.) The records from March 2014 to May 2017 make no mention of back pain. (*See id.* at DHS Defs000273-409.) On June 21, 2017, Plaintiff again reported back pain. (*Id.* at DHS Defs000410; *see* Pl.'s L.R. 56.1 Resp. ¶ 48.)

A CT scan of Plaintiff's back taken in August 2017 showed "severe degenerative changes." (Pl.'s L.R. 56.1 Resp. ¶ 53.) Defendant Dr. Nidea attributed the changes to a "previous injury"—likely from the car accidents referenced above. (*Id.* ¶ 54.) The parties agree that Plaintiff "perform[ed] his own exercise regimen in his room" and that Dr. Nidea could not "say whether those exercises [were] beneficial for Plaintiff's pan management because" he did not know what the exercises were. (*Id.* ¶ 55.)

**B.      Complaints About Cold Room**

Plaintiff also alleges that Defendants repeatedly ignored his complaints about the cold temperature in his room, and that the cold exacerbated his back pain and caused his prostate to enlarge. (*See, e.g.*, Pl.'s L.R. 56.1 Resp. ¶¶ 49, 52.) According to Plaintiff, Defendants moved him to a new room in the N unit in January 2012; the room was too cold; he complained about the temperature orally and in writing for five years; and Defendants ignored his complaints. (*See*

8

id. ¶ 49.)  The following are undisputed facts relevant to these allegations.

Plaintiff testified at his deposition that it was "always cold" in room N-3.  (Pl.'s Dep., Ex. 3 to Defs.' L.R. 56.1 Stat. [85-3] at 63:8-15;  *see* Pl.'s L.R. 56.1 Resp. ¶ 50.)  At Monthly Staff Meetings, Plaintiff complained to Defendant Hardy about the cold room and told him "he was experiencing discomfort."  (Pl.'s L.R. 56.1 Resp. ¶ 10.)  Plaintiff also told Defendant Pharis "that his room was too cold."  (*Id.* ¶ 20.)  In Plaintiff's response to Pharis's First Set of Interrogatories, cited by Defendants, Plaintiff stated that he told Pharis about the cold temperature when Pharis visited his room and "renewed [that] complaint over the course of many years," but "[n]o action was taken."  (Pl.'s Resp. to Pharis Interrogatories ¶ 2;  *see* Defs.' L.R. 56.1 Stat. ¶ 20 (citing same).)  Dr. Nidea testified during his deposition that he was "informed" that Plaintiff's room was too cold.  (Defs.' L.R. 56.1 Resp. ¶ 9 (citing Dr. Nidea Dep. at 34:11-24).)  Plaintiff does not offer evidence that he communicated directly with Defendants Dr. Mohiuddin or Kiss about the temperature of his room.  Rather, he repeats his allegations that those Defendants were or should have been aware of the complaints by virtue of their job duties.  (*See* Pl.'s L.R. 56.1 Resp. ¶¶ 24, 26, 30.)

Plaintiff submitted at least two written complaints about the temperature in his room.  (*Id.* ¶ 13.)  The first, dated December 18 or 19, 2013, states that Plaintiff's room was too hot.  (*See id.* ¶¶ 13-14;  *see also* EMHC Consumer Complaint/Concern Form, Ex. 6 to Defs.' L.R. 56.1 Stat. ("Room Temp. Compl.") [88-1] at 1-2 ("The temperature in the room is too hot.  I have requested an [sic] new room for 5 months already . . . . Tom Comeford . . . refuses to move me.  I have not been given a reason for the refusal.").)  In response, Defendant Comeford submitted a work ticket dated December 18, 2013, which states: "Please adjust temperature—patient room too warm."  (Work Tickets, Ex. 7 to Defs.' L.R. 56.1 Stat. [88-2] at 1.)

Plaintiff's second written complaint is dated September 21, 2015.  (*See* Pl.'s L.R. 56.1 Resp. ¶ 13; Room Temp. Compl. at 3.)  It states that the room temperature "[is] very uncomfortable.  In the wintertime its [sic] way too hot and during the summertime its [sic] too cold."

(Room Temp. Compl. at 4.) The complaint continues, in relevant part: "I have a serious medical condition and the extreme shifts in temperature affects [sic] my arthritis. I often get muscle spasms or body aches and pain . . . . I've complained about my room temperature for over three years and nothing has been resolved." (*Id.*) In response, Defendant Comeford submitted a work ticket dated September 21, 2015, which states: "Please check temperature in patient room— patient complains room is too cold in the summer and too hot in the winter." (Work Tickets at 2.) An e-mail dated September 22, 2015, from Defendant Comeford to Defendant Pharis (and a third party) states that an engineer checked Plaintiff's room temperature "today" and found it was 74 degrees. (Sept. 2015 E-mail, Ex. 8 to Defs.' L.R. 56.1 Stat. [88-3].) The parties agree that Plaintiff submitted a written complaint to Defendant Hardy "regarding his cold room." (Pl.'s L.R. 56.1 Resp. ¶ 12.) The court is uncertain whether this is a reference to the September 2015 complaint.

## DISCUSSION

Defendants have moved for summary judgment, arguing that the undisputed facts show they did not act with deliberate indifference to any of Plaintiff's serious medical needs, did not intentionally inflict emotional distress, and are entitled to qualified immunity and sovereign immunity. Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute exists, and summary judgment is precluded, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of showing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In considering a motion for summary judgment, the court draws all reasonable inferences in favor of the non-moving party. *See McCann v. Ogle Cnty.,* 909 F.3d 881, 886 (7th Cir. 2018).

## A.    Section 1983 Claims

A threshold issue for the court is what protections are afforded to someone who, like

10

Plaintiff Nadzhafaliyev, is involuntarily confined but has not been convicted of a crime. Nadhzhafaliyev has invoked both the Eighth Amendment, which prohibits cruel and unusual punishment of prisoners, and the due process clause of the Fourteenth Amendment, which protects pretrial detainees, but those standards differ. *See Kingsley v. Hendrickson*, 576 U.S. 389, 391, 400 (2015) (explaining that "[t]he language of the two Clauses differs, and the nature of the claims often differs. Importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically'" (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 & n.40 (1977)); *Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020) (pretrial detainee's "claim of deficient medical treatment" is "analyzed under the Fourteenth Amendment, rather than under the Eighth Amendment standard applied to prisoners"); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018) ("[C]laims of state detainees being held on probable cause arise under the Fourteenth Amendment's Due Process Clause."). Similarly, the Fourteenth Amendment's Due Process Clause protects civil detainees, such as those involuntarily committed to a mental institution. *See Youngberg v. Romeo*, 457 U.S. 307, 314-16 (1982). This is because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22; *see Smego v. Jumper*, 707 F. App'x 411, 412 (7th Cir. 2017) ("Because Smego is a civil detainee—not a prisoner—his claims derive from the Fourteenth Amendment's guarantee of due process, not the Eighth Amendment's right to be free from cruel and unusual punishment.").

Plaintiff in this case was involuntarily committed to EMHC after a finding of not guilty by reason of insanity. Neither the Supreme Court nor the Seventh Circuit has directly addressed whether it is the Eighth or Fourteenth Amendment that affords protection in this circumstance. The Supreme Court, however, has suggested that it is the Fourteenth Amendment that is relevant here, because the purpose of confinement is the same as for other civil detainees: to treat, not to punish. *See Jones v. United States*, 463 U.S. 354, 368 (1983) ("The purpose of commitment

following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness."); *see Foucha v. Louisiana*, 504 U.S. 71, 73, 80 (1992) (similar). In the absence of contrary authority, the court concludes that the Fourteenth Amendment's due process clause governs Plaintiff's Section 1983 claims. Both sides approve this approach. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Br.") [84] at 6-7 & n.3 (arguing that Plaintiff's "status was comparable to that of a pretrial detainee," and maintaining that Defendants are entitled to summary judgment even if Plaintiff had properly pleaded his claims under the Fourteenth Amendment's Due Process Clause)); Pl.'s Opp. at 3 (arguing that the court should construe Plaintiff's claims as having been brought under the Fourteenth Amendment).)

Having agreed that Plaintiff's claims arise under the Fourteenth Amendment, both sides also appear to agree that the governing standard for Eighth and Fourteenth Amendment claims are functionally the same—that is, a "deliberate indifference" standard. (*See* Defs.' Mot. at 7 n.3; Pl.'s Opp. at 3.) In doing so, the parties overlook the Seventh Circuit's decision in *Miranda*, which applied *Kingsley's* objective inquiry to claims by pretrial detainees of constitutionally inadequate medical treatment, replacing the Eighth Amendment's deliberate indifference standard. *See Kingsley*, 576 U.S. at 395-98; *Miranda*, 900 F.3d at 352. Later, the Seventh Circuit held that "*Kingsley*'s objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees." *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). The court will apply that objective standard to the fully developed record in this case.

To succeed on a conditions-of-confinement claim (including an allegation of inadequate medical care) under that standard, Plaintiff must show, first, that "the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [his] case," because "negligent conduct does not offend the Due Process Clause." *Miranda*, 900 F.3d at 353; *see also Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Second, Plaintiff must show that Defendants' conduct was objectively unreasonable. *Miranda*,

900 F.3d at 354. "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886. Plaintiff must also show that the conditions in question are or were objectively serious. *See, e.g.*, *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (to survive summary judgment, the plaintiff must identify a genuine dispute of material fact concerning whether he "suffered from an objectively serious medical condition"). The objective inquiry articulated in *Kingsley* and its progeny is "less demanding" than the deliberate indifference standard. *Smego*, 707 F. App'x. at 412.

### 1. Failure to Provide a Medical Accommodation (Bed)

#### a. Objectively Serious Condition

Plaintiff alleges that Defendants failed to provide a reasonable medical accommodation for his back pain by refusing his requests for a better sleeping surface. Defendants appear to maintain that Plaintiff's back pain was not an objectively serious medical condition because certain medical records show that "Plaintiff affirmatively denied that he was experiencing any back pain." (Defs.' L.R. 56.1 Stat. ¶ 47; *see* Defs.' Br. at 4.) The records do THshow that Plaintiff denied having pain between May 2013 and February 2014, but Plaintiff resided at EMHC for much longer—from 2005 or 2006 through March 2019. It is undisputed that Plaintiff sustained back injuries before he arrived at EMHC and suffered from chronic back pain. There is also evidence that Plaintiff repeatedly complained about the pain to Defendants Dr. Nidea, Comeford, Pharis, and Hardy. And a CT scan of Plaintiff's back taken in August 2017 showed "severe degenerative changes." (Pl.'s L.R. 56.1 Resp. ¶ 53.) A jury reasonably could conclude from this evidence that Plaintiff experienced back pain for years while he lived at EMHC, despite records showing that he denied pain between May 2013 and February 2014. Thus, there is enough evidence to support a finding that Plaintiff suffered from an objectively serious medical condition. *See, e.g.*, *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (concluding that the plaintiff's descriptions of his

"excruciating pain" and a "diagnosis of a muscle spasm" requiring treatment supported a finding that his "muscle spasm and the accompanying back pain" was an objectively serious medical condition); *Diaz v. Godinez*, 693 F. App'x 440, 443 (7th Cir. 2017) ("We even have acknowledged that chronic arthritis pain is a serious medical need . . . as are other conditions that cause serious or chronic pain . . . ." (citations omitted)).

### b. Whether Defendants Acted Purposefully, Knowingly, or Recklessly

The court next asks whether Plaintiff has shown that Defendants acted "purposefully, knowingly, or . . . recklessly when they considered the consequences" of handling his request for a bed accommodation. *Miranda*, 900 F.3d at 353. Plaintiff has identified a genuine dispute of fact on this issue for Defendants Comeford, Pharis, and Hardy. There is evidence that Plaintiff complained for years to those Defendants about his back pain and asked them for a bed accommodation. There is also evidence that these Defendants had the authority to approve the accommodation; indeed, Dr. Nidea testified that he had to ask them to do so. Although Defendant Comeford stated that he was "unable to resolve" one complaint (Defs.' L.R. 56.1 Resp. ¶ 6), Defendants do not argue that he lacked authority to address the problem. Finally, it is undisputed that Defendants Pharis and Hardy refused Dr. Nidea's request in 2005 or 2006 to give Plaintiff a bed accommodation and that Plaintiff did not receive one until 2016, despite his persistent complaints about pain—including complaints to Defendant Comeford beginning in 2011. Accordingly, a jury reasonably could conclude that these Defendants acted purposefully, knowingly, or recklessly in handling Plaintiff's requests for a bed accommodation.[5]

On the other hand, Plaintiff cannot clear this hurdle for Defendants Dr. Nidea, Kiss, and Dr. Mohiuddin. Plaintiff does not provide any evidence that Dr. Nidea ignored or refused his

---

[5] The court is not persuaded otherwise by Defendants' argument that in Plaintiff's deposition, he admitted that Pharis and Hardy did not refuse to give him the bed he requested. (*See* Defs.' L.R. 56.1 Stat. ¶¶ 11, 21; Defs.' Br. at 10.) Plaintiff merely clarified that he meant to allege that those Defendants communicated the refusal to Dr. Nidea, not to him. (*See* Pl.'s Dep. at 47:1-48:10.)

request for a bed accommodation. To the contrary, the undisputed evidence shows that Dr. Nidea tried to get a bed accommodation for Plaintiff.[6] Plaintiff also fails to offer evidence that Defendants Kiss and Dr. Mohiuddin were aware of his requests for a bed accommodation. That Dr. Mohiuddin was Plaintiff's psychiatrist does not support a reasonable inference that he knew about or ignored the requests. In addition, the record lacks evidence that Dr. Mohiuddin attended Monthly Staff Meetings in which Plaintiff made the requests. The evidence does not support a finding that Dr. Mohiuddin was "personally responsible for the alleged" constitutional deprivation, and as a result, he cannot be held liable under Section 1983. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). The court grants Defendants' motion for summary judgment on the claim for failure to provide a bed accommodation against Defendants Dr. Nidea and Dr. Mohiuddin.

Regarding Defendant Kiss, the court notes that Comeford sent her a copy of the October 3, 2016 e-mail, which discussed safety concerns about the plywood board and Plaintiff's request for a foam mattress. (*See* Oct. 2016 E-mails at 1.) But Plaintiff does not discuss this evidence, and the court concludes that this e-mail would not by itself permit a jury to conclude that Kiss knew about Plaintiff's repeated demands for a bed accommodation. Plaintiff is left with his argument that Kiss should be held liable because she supervised the other Defendants and learned about his requests through them. "[T]here is no respondeat superior liability for claims under § 1983," however. *Diaz*, 693 F. App'x at 444 (citing *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008)). Apart from the October 3, 2016 e-mail just referenced, there is no evidence that Kiss knew about Plaintiff's requests. Therefore, the court grants Defendants' motion for summary judgment on the claim for failure to provide a bed accommodation against Defendant Kiss in her

---

[6] Even if a jury could find that Dr. Nidea acted purposefully, knowingly, or recklessly, no jury could find that Dr. Nidea's failure to obtain the bed accommodation was objectively unreasonable. The evidence shows that Dr. Nidea lacked authority to obtain the accommodation; indeed, he had to ask Defendants Comeford, Pharis, and Hardy for approval. *See, e.g., Turner*, 953 F.3d at 1016 ("Because the medical defendants had no control over the scheduling of the appointments, Turner cannot claim that their failure to schedule him for surgery, or their failure to nag the residents, constituted objectively unreasonable conduct.").

individual capacity. If Plaintiff's claim against Kiss in her official capacity was intended to be one for municipal liability, the court concludes that Plaintiff abandoned it by failing to argue that he has satisfied the requirements set forth in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Accordingly, the court grants Defendants' motion for summary judgment on the claim against Kiss in her official capacity as well.

### c. Whether Defendants' Actions Were Objectively Reasonable

Because a jury reasonably could find that Defendants Comeford, Pharis, and Hardy acted purposefully, knowingly, or recklessly, the court asks whether a jury could find that those Defendants handled Plaintiff's requests for a bed accommodation in an objectively unreasonable manner. *Miranda*, 900 F.3d at 354. Defendants argue that no jury could find that they were deliberately indifferent because the bed accommodation was not medically necessary. (*See* Defs.' Br. at 8.) The proper standard is objective, however. True, it was Plaintiff's idea to obtain a better sleeping surface, and there is no evidence that Dr. Nidea or any of Plaintiff's other doctors made an independent determination that a bed accommodation was medically necessary. But the reason Defendants Pharis and Hardy gave for refusing the request in 2006 had nothing to do with medical necessity: they were concerned that a plywood board would be unsanitary or unsafe. And although Defendant Comeford was not a Nurse Manager in 2006, there is sufficient evidence to support a finding that he became aware of this rationale and applied it after he became a Nurse Manager in 2011. (*See* Sept. 2016 Comeford E-mails at 1 (stating that the safety and sanitation issues with the plywood board had "been addressed before").)

Similarly, there is no evidence that Defendants refused Plaintiff's request for a hospital bed on the ground that it was medically unnecessary. Some evidence suggests that EMHC gives hospital beds to patients only when they are medically necessary (*see* Mar. 28, 2016 Tiu E-mail at 1; Sept. 2016 Comeford E-mails at 1), but Defendants ignored that purported rule here: they eventually gave Plaintiff a hospital bed despite maintaining that it was medically *unnecessary*. According to Dr. Nidea's testimony, Defendants provided the bed because another patient

16

decided he no longer wanted it. The evidence also suggests that Defendants made no effort to obtain a determination that any of Plaintiff's requested accommodations were medically necessary. Their failure to do so is surprising considering that Plaintiff's primary care physician, Defendant Dr. Nidea, asked Defendants on several occasions if they could provide a bed accommodation for Plaintiff. Finally, Dr. Nidea testified during his deposition that he asked Defendants to give Plaintiff a hospital bed because "we hadn't gotten the proper mattress for him. And well, he still continues to complain of lack of bed support." (Dr. Nidea Dep. at 43:22-44:1.) That testimony could support a reasonable finding that Dr. Nidea ultimately concluded that a hospital bed was medically necessary, and therefore creates a genuine dispute about the issue. It could also support a reasonable finding that Defendants could have obtained a determination of medical necessity sooner if they had asked for one. In these circumstances, a jury reasonably could conclude that it was objectively unreasonable for Defendants Comeford, Hardy, and Pharis to refuse Plaintiff's requests for a bed accommodation for approximately 10 years.

Defendants contend that the delay in providing a bed accommodation "was rationally related to important governmental interests" (Defs.' Br. at 1), but they do not develop this argument. (*See generally* Defs.' Br.; Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply") [107].) The court assumes Defendants are referring to their safety and sanitation concerns about the plywood board. By ultimately giving Plaintiff a plywood board and allowing him to keep it, Defendants undermine their argument that the delay was rationally related to safety and sanitation concerns. They also compromise their position that the concerns were genuine. Accordingly, a jury reasonably could conclude that Defendants' conduct was objectively unreasonable despite their purported safety and sanitation concerns.

Defendants' contention that Plaintiff suffered no harm as a result of their conduct is also unpersuasive. (*See* Defs.' Br. at 8 (arguing that Plaintiff cannot establish a constitutional violation without showing harm from failure to provide medical care).) According to Defendants, they never deprived Plaintiff of a mattress or forced him to sleep on the floor. (*Id.* at 8-9.) But there is

17

evidence that for many years, Plaintiff complained that the mattress Defendants provided did not support his back and requested a new one that would help his pain. (*See, e.g.*, Dr. Nidea Dep. at 28:21-29:1 (testimony that Plaintiff asked for better bed support to alleviate his pain); *id.* at 43:22-44:1 (testimony that as of 2018, "we hadn't gotten the proper mattress for him" and "he still continues to complain of lack of bed support").) In addition, Dr. Nidea testified that "bed supports" like "a firm mattress" can help support a person's back. (*Id.* at 27:6-14.) Although Dr. Nidea also testified that the "severe degenerative changes" reflected in Plaintiff's August 2017 CT scan resulted from a "previous injury" (*see* Pl.'s L.R. 56.1 Resp. ¶¶ 53, 54), a jury considering the totality of the evidence could reasonably conclude that Plaintiff suffered additional pain as a result of Defendants' delay in providing a bed accommodation. That Plaintiff did exercises in his room would not require a jury to find that the back pain was entirely self-imposed, as Defendants seem to suggest. (*See, e.g.*, Defs.' Br. at 9.)

Finally, Defendants argue that they are entitled to qualified immunity. To decide whether Defendants are entitled to qualified immunity, the court asks two questions: "first, whether the constitutional right asserted by the plaintiff[ ] was clearly established at the time the defendants acted; and second, whether defendants' actions violated that clearly established right." *Hardeman*, 933 F.3d at 820. "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." (*Id.* (internal quotation marks omitted)). For the reasons just explained, the evidence would permit a reasonable jury to find that Defendants violated Plaintiff's right to due process under the Fourteenth Amendment by denying his requests for a bed accommodation to alleviate back pain. Indeed, a prisoner has an Eighth Amendment right to be free from the "unnecessary and wanton infliction of pain," *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), and "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009). The court concludes Defendants are not entitled to qualified immunity and court denies the motion for summary judgment on the claims against Defendants

Comeford, Pharis, and Hardy for failure to provide a bed accommodation.

### 2.    Failure to Provide a Medical Accommodation (Cold Room)

Plaintiff also alleges that Defendants ignored his medical needs by disregarding his complaints about the cold temperature in his room for five years, beginning in January 2012. (*See, e.g.*, Pl.'s L.R. 56.1 Resp. ¶ 49.)  According to Plaintiff, the cold temperature exacerbated his back pain and caused prostate problems.  (*See, e.g.*, *id.* ¶ 52.)  "[P]risoners have a right to protection from extreme cold."  *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997); *see also Shelby Cnty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986) (inmates have a "right to be free from extreme hot and cold temperatures").  Because Plaintiff was entitled to more protection than a prisoner, he, too, enjoyed this right.  Courts "examine several factors in assessing claims based on low cell temperature," including "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Godinez*, 114 F.3d at 644.  No single factor is determinative.  *Id.*

Defendants argue that Plaintiff cannot support the allegation that they forced him to live in an unreasonably cold room at any time during his detention at EMHC.  (*See* Defs.' Br. at 11-12.) The court agrees.  Plaintiff contends that he began complaining about the cold temperature in January 2012 and persisted in his complaints for five years, but the record contains only two written complaints from Plaintiff.  The first is dated December 2013—nearly a year after the cold allegedly began—and states that Plaintiff's room was too hot.  The second is dated September 2015 and states that Plaintiff's room was too hot in the winter and too cold in the summer. Defendant Comeford submitted work requests to address the temperature within a day of each complaint , and Plaintiff does not dispute that in September 2015, the recorded temperature in his room was 74 degrees.  Considering this evidence, no reasonable jury could find that Plaintiff's room was too cold, let alone that the cold was "severe" or persistent.  *Godinez*, 114 F.3d at 644.

The court recognizes that in the September 2015 complaint, Plaintiff wrote that

Defendants had ignored his temperature-related complaints for more than three years. (*See* Room Temp. Compl. at 4.) Contrasted with the other evidence just discussed, however, this statement is too vague to permit a reasonable inference that Plaintiff lived in extreme cold for an unconstitutionally long period of time. So, too, is Dr. Nidea's deposition testimony that at some point, he learned about the cold temperature in Plaintiff's room. Finally, there is no evidence that Plaintiff lacked "means to protect himself" from the allegedly cold temperature. *Godinez*, 114 F.3d at 644. And although a jury reasonably could conclude that Plaintiff "endure[d] other uncomfortable conditions"—*i.e.*, a poor sleeping surface—no jury could find that this factor alone supports Plaintiff's otherwise unsubstantiated claim that his room was too cold. *Id.* at 644. For these reasons, the court grants Defendants' motion for summary judgment on the claim that they failed to provide a medical accommodation in the form of a warmer room.

### 3. Failure to Treat

In his Third Amended Complaint, Plaintiff alleges that Defendants Hardy, Pharis, and Comeford violated his constitutional rights by refusing to send him to an outside specialist for treatment of his back pain. (*See* Third Am. Compl., Count II.) Plaintiff offers no evidence to support this claim and does not address it in his opposition to Defendants' motion for summary judgment. The court concludes that Plaintiff has forfeited the claim and grants Defendants' motion.

### B. Intentional Infliction of Emotional Distress

Plaintiff asserts claims against all Defendants for intentional infliction of emotional distress ("IIED") under Illinois law. The claims are based on Defendants' alleged failure to give Plaintiff a flat sleeping surface and fix the cold temperature in his room. (*See* Pl.'s Opp. at 8; *see also* Third Am. Compl. ¶ 60.)[7] The court has already determined that no reasonable jury could find in

---

[7] Plaintiff also argues that Defendants caused emotional distress by "limiting his privileges" and preventing him from obtaining treatment from physicians outside EMHC. (*See* Pl.'s Opp. at 9.) Plaintiff offers no evidence to support these allegations, however, so the court disregards them.

Plaintiff's favor on the constitutional claims against Defendants Dr. Nidea, Dr. Mohiuddin, and Kiss. Accordingly, the court grants the motion for summary judgment on the IIED claims against those Defendants. It has also determined that no reasonable jury could find in Plaintiff's favor on the constitutional claims concerning the temperature of his room. That leaves IIED claims against Defendants Comeford, Pharis, and Hardy based on their failure to provide a bed accommodation.

Defendants argue that the IIED claims are barred by sovereign immunity. The Illinois State Lawsuit Immunity Act provides that, with exceptions not relevant here, "the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1; *see also Murphy v. Smith*, 844 F.3d 653, 656 (7th Cir. 2016) (stating that 745 ILCS 5/1 "governs claims in federal court arising under state law"). Although Plaintiff has sued Defendants Comeford, Pharis, and Hardy in their individual capacities, "[n]aming state employees as defendants would be too simple an evasion of the statute." *Murphy*, 844 F.3d at 658. As Defendants correctly state, courts treat a claim against a state official as a claim against the state when three conditions are satisfied:

> [T]here are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State.

*Id.* (quoting *Healy v. Vaupel*, 133 Ill. 2d 295, 309, 140 Ill. Dec. 368, 375, 549 N.E.2d 1240, 1247 (1990)). But Defendants overlook an exception to the Act that is outcome-determinative in this case: "The doctrine of sovereign immunity affords no protection . . . when it is alleged that the State's agent acted in violation of statutory or constitutional law . . . ." *Leetaru v. Bd. of Trs. of Univ. of Ill.*, 2015 IL 117485 ¶ 45, 392 Ill. Dec. 275, 287, 32 N.E.3d 583, 595 (2015) (internal quotation marks omitted); *see also, e.g.*, *Murphy*, 844 F.3d at 658-59; Pl.'s Opp. at 9. "This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not." *Murphy*, 844 F.3d at 659 (quoting *Leetaru*, 2015 IL 117485 ¶ 46, 392 Ill. Dec. at 288, 32 N.E.3d at 596). Because a jury reasonably could find that Defendants Comeford, Pharis, and Hardy violated Plaintiff's right to

due process under the Fourteenth Amendment, sovereign immunity does not bar the IIED claims against them. *See*, *e.g.*, *Murphy*, 844 F.3d at 660 (sovereign immunity did not bar prisoner's claim for aggravated battery under Illinois law where prisoner "proved that the defendants' actions violated the United States Constitution").

On the merits, Defendants advance just one argument: the IIED claims "necessarily fail" because "Plaintiff cannot show that Defendants were deliberately indifferent to [his] medical needs" and "the bar for establishing deliberate indifference is lower than that for establishing intentional infliction of emotional distress . . . ." (Defs.' Br. at 14; *see also* Defs.' Reply at 2-3, 6 (citing *Hardy v. Hardy*, No. 10 C 5921, 2013 5325077 (N.D. Ill. Sept. 20, 2013)(collecting cases).) As explained earlier, Plaintiff's constitutional claim is governed by an objective standard of reasonableness, not by the standard of deliberate indifference. The court has concluded that a jury reasonably could find in Plaintiff's favor under that objective standard. Defendants presumably would argue that Plaintiff's satisfying that lower objective standard is not sufficient to establish intentional infliction of emotional distress, but they have not addressed that standard, nor have they offered other valid reasons for dismissal of the IIED claims. The motion for summary judgment on those claims is denied without prejudice.

## CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Defendants' Motion for Summary Judgment [83]. The court denies the motion for summary judgment on Plaintiff's claims against Defendants Tom Comeford, Jeff Pharis, and Daniel Hardy for failure to provide a bed accommodation for Plaintiff's back pain. In addition, the court denies the motion for summary judgment against the same Defendants for intentional infliction of emotional distress. The court grants the motion for summary judgment in all other respects and dismisses claims against Defendants Nidea, Mohiuddin and Kiss. Count III of the Third Amended Complaint is dismissed with prejudice as moot.

The parties are directed to submit, on or before January 15, a joint written report on the

22

status of their discovery; efforts, if any, to resolve the case; and their interest, if any, in referral of this matter to Magistrate Judge Gilbert for settlement conference.

ENTER:

Dated:  November 30, 2020

REBECCA R. PALLMEYER
United States District Judge